# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5849 | **DATE** | 1/26/2004 |
| **CASE TITLE** | Sutter Insurance vs. Applied Systems | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, defendant's motion for summary judgment (26-1) is granted in part and denied in part. The motion is granted as to Counts 2 and 4, although Count 4 will proceed to trial for the reasons discussed earlier. The motion is otherwise denied. Applied's motion to strike is denied (40-1) and Sutter's motion to strike is denied as moot (30-1). Defendant's motion to strike plaintiff's jury demand is granted (29-1). The case will proceed as a bench trial on 2/9/04 at 9:45 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | JAN 2 8 2004 | 45 |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | |
| OR | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in Central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUTTER INSURANCE CO., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 02 C 5849 |
| ) | |
| APPLIED SYSTEMS, INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this case, plaintiff Sutter Insurance Co., a California corporation headquarted near San Francisco, has sued defendant Applied Systems, Inc., an Illinois corporation headquartered in University Park, Illinois, for breach of contract, consumer fraud under Illinois and California statutes, and common law fraud. Applied has counterclaimed for breach of contract. The case is set for a jury trial on February 9, 2004. Applied has moved for summary judgment on Sutter's claims and, if summary judgment is denied, to strike Sutter's jury demand.

### Facts

Sutter sells property insurance in the West Coast region. Applied develops and sells software for use by insurance companies and insurance agencies. In 1999, Sutter began searching for software to replace its existing system. Applied and other software providers sent representatives to Sutter's California offices to promote and demonstrate their products. Applied's presentation concerned its "Diamond System," a comprehensive policy, claims management and billing system designed to interact with third party software applications.

According to Sutter, Applied's representatives represented that the Diamond System could be implemented immediately "off the shelf," would conform the Sutter's own forms and billing procedures, and would allow Sutter immediately to create new insurance policies and have them rated, underwritten, issued, and billed. Sutter also contends that Applied represented that implementation management services would be included for a flat fee that would cover software licensing, system analysis, specification documentation, and system development, installation, and training, and that the program would be up and running within 180 days after Sutter signed a contract with Applied.

Sutter contends that it relied on Applied's representations and entered into a System Implementation and Licensing Agreement with Applied in March 2000. The agreement included a paragraph stating that the software would substantially conform to and perform in accordance with specifications listed in the agreement and that all services provided by Applied under the agreement would be performed in a good and workmanlike manner. Agreement ¶ 6(a). The same paragraph included the following disclaimer:

> ALL REPRESENTATIONS AND WARRANTIES CLAIMED HEREIN ARE EXPRESSLY IN LIEU OF ANY AND ALL OTHER PREVIOUS REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WHICH MAY HAVE BEEN SET OUT DURING THE NEGOTIATION OF THIS AGREEMENT. APPLIED SYSTEMS SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.

*Id.* The following paragraph of the agreement stated:

> No material statements or representations have been made by Applied and upon which [Sutter] has relied in entering into this Agreement that are not contained herein.

*Id.* ¶ 6(b). Paragraph 1 of the agreement stated that "[t]his Agreement ... contains the entire

2

agreement between the parties, and Applied is not bound by any representations or inducements not set forth herein." *Id.* ¶ 1. The final paragraph of the agreement stated that

> EACH PARTY ACKNOWLEDGES THAT IT HAS READ THIS AGREEMENT, UNDERSTANDS IT AND AGREES TO BE BOUND BY ITS TERMS AND FURTHER AGREES THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN THE PARTIES, EXCEPT AS HEREIN CONTEMPLATED TO ADD APPENDICES HERETO, WHICH SUPERSEDES ALL PROPOSALS, ORAL OR WRITTEN AND ALL OTHER COMMUNICATIONS BETWEEN APPLIED AND [SUTTER] RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

*Id.* ¶ 24.

According to Sutter, the software did not work "off the shelf" as represented, and the company experienced numerous and constant problems in operating the system. It claims that it advised Applied of these problems as they arose, but Applied failed to cure them. On May 1, 2001, a telephone conference was held between representatives of Sutter and Applied. Sutter's vice president Diane Kleinecke has stated in an affidavit that during this telephone conference, she advised Applied's representatives that Sutter was canceling the contract and did not want to invest any more time in the Diamond System because it was not meeting Sutter's needs. She advised that Sutter would "run off" the homeowner's insurance policies already entered into the system and after that would cease using the system.

Sutter continued to use the Diamond System for about ten months thereafter but asserts that it did so only to avoid substantial hardship, as it had no other alternative short of 100% "manual" management of the policies, which it says was not feasible. On October 29, 2001, Bill Kleinecke, another Sutter vice president, sent Applied a letter which Sutter characterizes as a written cancellation of the contract; the letter stated that "[i]n follow up to our conversation, I am

writing to you to reiterate the Sutter Insurance Companies [sic] desire for return compensation. In order to avoid further costs associated with Applied's failure to perform, the Management of Sutter was hoping for a voluntary return of the fees and charges collected." Sutter Rule 56.1 Stmt., Ex. C.

Sutter contends that due to the defects in Applied's software system, it suffered out of pocket losses as well as lost business opportunities. Its complaint against Applied includes four claims: a claim for breach of the written agreement premised primarily on its allegation that the software did not meet the agreement's specifications; a claim of common law fraud; a claim under the Illinois Consumer Fraud and Unfair Business Practices Act; and a claim under the California Unfair Business Practices Act. Applied has counterclaimed for amounts allegedly due under the agreement that Sutter did not pay. As indicated earlier, Applied has moved for summary judgment on all of Sutter's claims and, if summary judgment is denied as to any of the claims, to strike Sutter's jury demand.

## Motion for summary judgment

In addressing a motion for summary judgment, the Court construes the record in the light most favorable to the non-moving party; we do not weigh the evidence but rather determine only whether there is a genuine issue for trial. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir 2003); *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002).

### 1. Breach of contract claim

Applied argues, and Sutter does not dispute, that Sutter's breach of contract claim is subject to the terms of Illinois' version of the Uniform Commercial Code. Under the Code, a buyer of goods must pay at the contract rate for any goods accepted. 810 ILCS 5/2-607(1). A

4

buyer that has accepted goods is barred from any remedy for non-conforming goods unless it notifies the seller of the breach within a reasonable time after it discovers or should have discovered the breach. *Id.* 2-607(3)(a). Relying on a provision of the contract stating that "[a]ll notices given under this Agreement shall be in writing," Agreement ¶ 21, Applied contends that Sutter never gave written notice of its rejection of the Diamond System and thus is barred from seeking damages for breach of contract.

Sutter contends that it advised Applied of the breach during the May 1, 2001 telephone conference and argues that the contract did not require notices of cancellation or breach to be in writing. First, it says that paragraph 20 of the agreement – the provision on which Sutter, for some reason, thinks Applied is relying for its "written notice only" argument – concerns only requests for mediation of disputes. That is, in fact, what paragraph 20 concerns, but it is clear from Applied's papers that it is relying on paragraph 21, not paragraph 20. Paragraph 21 expressly concerns "[a]ll notices given under this Agreement," not just notices relating to paragraph 20's mediation provision. There are numerous provisions in the agreement that refer to the giving of notice, *see* Agreement ¶¶ 6(h), 8(b), 9 & 10(b), and paragraph 21 applies to all of them.

Sutter also argues that cancellation of the agreement pursuant to paragraph 5 does not implicate a "notice under this Agreement" that paragraph 21 requires to be in writing. It is true that paragraph 5, the agreement's cancellation provision, does not specifically require "notice" of the cancellation. But that is the only reasonable reading of the agreement's terms. When the agreement states that either party "may cancel this Agreement, with or without cause" at various intervals, *see* Agreement ¶ 5(a) & (b), an event which triggers a refund of Sutter's down

payment, it is self-evident that a cancellation can occur only if the canceling party notifies the other party – otherwise, in the event of a cancellation by Sutter, how would Applied become aware of its obligation to make a refund? Because a cancellation cannot be said to occur without notice by the canceling party, paragraph 21 requires it to be in writing.

On the other hand, UCC section 2-607(3)(a) does not require notice of *cancellation*; it simply requires notice of a breach. The Court does not believe that this obligation, imposed not by under the agreement but rather by the UCC, is a "notice under [the] Agreement" that paragraph 21 requires to be in writing. Cancellation under the agreement's terms is a unique and drastic event that carries with it specific contractual consequences. Notice of a breach is much less drastic; contractual breaches can be cured. The agreement nowhere requires written notice any time a party claims that the other party has breached, nor does it mandate that notices required under the UCC must be in writing. For this reason, the Court rejects Applied's argument that the May 1, 2001 telephone conference is insufficient as a matter of law to qualify as notice of the alleged breaches of the agreement.

Even were the contract to be read to require any notice required under the UCC to be in writing, Sutter's October 29, 2001 letter would suffice. The letter specifically referred to Sutter's "desire for return compensation," a desire that makes sense only in the event of a breach by Applied. And indeed, the letter also specifically referenced Applied's "failure to perform."

Applied also argues that Sutter's continued use of the software after the alleged notification of breach bars its breach of contract claim. Section 2-602 of the Illinois UCC states that if a buyer's rejection of goods must come "seasonably" after the tender, and that after rejection, any exercise of ownership by the buyer is "wrongful against the seller" and entitles the

seller to seek relief under section 2-703. The Seventh Circuit has also held that a buyer's "continued use of goods after acceptance has purportedly been revoked is inconsistent with, and invalidates, the supposed revocation unless such use was necessary to avoid substantial hardship." *See, e.g., L.S. Heath & Son, Inc. v. AT&T Info. Systems, Inc.*, 9 F.3d 561, 568 (7th Cir. 1993). This principle results, presumably, from section 2-606(1)(c), which provides that "acceptance" occurs if the buyer does anything that is inconsistent with the seller's ownership. *See Computerized Radiological Servs. v. Syntex Corp.*, 786 F.2d 72, 75 (2d Cir. 1986) (cited in *L.S. Heath*, 9 F.3d at 568). *See also, Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.*, 568 F. Supp. 432, 433 (N.D. Ill. 1983). But in this case, there is a genuine factual issue as to whether Sutter's continued use of the goods was within the "substantial hardship" exception; Sutter says its only other alternative would have been 100% manual management of the already-issued policies, which it says was impracticable given financial limitations. The Court rejects Applied's argument that Sutter's evidence in this regard is insufficient to create a genuine factual issue; though somewhat conclusory, Sutter has offered specifics sufficient to avoid summary judgment.

## 2.  Common law fraud claim

Sutter's common law fraud claim is barred as a matter of law. Sutter's claim is premised upon the proposition that Applied made verbal misrepresentations before the parties signed their contract regarding the capabilities of its software and the nature and quality of the support that Applied would offer. This claim is barred by the agreement's provisions in which Sutter affirmed that it had not relied upon any representations made by Applied prior to the contract's execution. Agreement ¶ 6(b). The Seventh Circuit has held that "a written anti-reliance clause

7

precludes any claim of deceit by prior representations." *Rissman v. Rissman*, 213 F.3d 381, 384 (7th Cir. 2000).[1] As the court stated in *Rissman*, "[a] non-reliance clause is not identical to a truthful disclosure, but it has a similar function: it ensures that both the transaction and any subsequent litigation proceed on the basis of the parties' writings, which are less subject to the vagaries of memory and the risks of fabrication." *Id.* Such clauses are upheld, at least when found in a contract like this one that is "between sophisticated commercial enterprises," and they preclude a suit for fraud. *See Vigortone AG Products, Inc. v. PM AG Products, Inc.*, 316 F.3d 641, 645 (7th Cir. 2002).

Sutter does not reference any trickery or deception in the negotiation of the agreement, and it identifies no basis to decline to enforce the agreement's non-reliance clause. Indeed, Sutter does not respond to Applied's argument concerning the effect of that clause other than to contend that some of the misrepresentations it claims Applied made prior to the contract's execution were repeated in the specifications contained in the contract, specifically in Schedule A which the contract included as an express warranty. *See* Applied Mem. at 14; Agreement ¶ 6(a). But even if this is so, Sutter is limited to a breach of contract action premised on the non-conformity of Applied's performance to the terms of the express warranty; it may not maintain a fraud action based on prior verbal misrepresentations upon which it expressly disclaimed reliance, and it may not convert the breach of warranty claim into a claim of common law fraud.

---

[1] The discussion in *Rissman* focused on the plaintiff's main claim in that case, a claim of fraud under the federal securities laws. However, the plaintiff's claims also included state law claims, *see* 213 F.3d at 382, and the concluding line of the court's decision made it clear that "the [parties' written] agreement extinguishes all of [plaintiff's] claims, under both state and federal law." *Id.* at 387.

8

### 3. Statutory consumer fraud claims

Applied has moved for summary judgment on Sutter's consumer fraud claims under the previously referenced Illinois and California statutes on bases that are somewhat at odds with each other. Its primary argument for summary judgment on the California claim is that the parties chose to apply Illinois law to their relationship, and one of its arguments for summary judgment on the Illinois claim is that the Illinois statute does not protect non-Illinois plaintiffs. The Court's conclusion is that Sutter can maintain a claim under the Illinois statute but not the California statute.

#### a. Illinois Consumer Fraud Act claim

Applied argues that the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) does not apply to non-Illinois consumers and thus Sutter, a California corporation with no operations or customers in Illinois, cannot maintain a claim under the Act. At least one District of the Illinois Appellate Court has held that the statute does not apply to non-Illinois consumers. *See Oliveira v. Amoco Oil Co.*, 311 Ill. App. 3d 886, 897-99, 726 N.E.2d 51, 60-62 (2000). But that decision was reversed by the Illinois Supreme Court on other grounds, *see Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 776 N.E.2d 151 (2002), and thus its precedential effect is not entirely clear. *But see Prime Leasing, Inc. v. Kendig*, 332 Ill. App. 3d 300, 313, 773 N.E.2d 84, 96 (2002) (citing the Fourth District's decision in *Oliveira* despite its reversal, though only in *dictum*).

Our task, of course, is to determine how the Illinois Supreme Court would determine the issue, *see, e.g., Allstate Ins. Co. v. Menard's Inc.*, 285 F.3d 630, 636-37 (7th Cir. 2002), and as the Appellate Court noted in *Oliveira*, the Supreme Court has not ruled on the point. Though the

9

court has indicated that the Act's purpose is "to protect Illinois consumers, borrowers, and businessmen," *Oliveira*, 311 Ill. App. 3d at 897, 726 N.E.2d at 60 (citing *Scott v. Ass'n for Childbirth at Home, Int'l*, 88 Ill. 2d 279, 288, 430 N.E.2d 1012, 1017 (1981)), it has upheld the certification of classes including non-Illinois consumers in two cases. *See id.* In one of those cases, the point was not discussed. *See Miner v. Gillette Co.*, 87 Ill. 2d 7, 428 N.E.2d 478 (1981). In the second, however, the Supreme Court relied on the fact that the contracts containing the purported deception were executed in Illinois, they contained a choice of law clause opting for the application of Illinois law, and they provided that complaints about the defendant's performance were to be directed to its Illinois office. *Martin v. Heinold Commodities, Inc.*, 117 Ill. 2d 67, 82-83, 510 N.E.2d 840, 847 (1987). At least two of these factors apply here: Applied argues that the contract's Illinois choice-of-law provision governs their entire relationship, not just the contract, and the contract required any notices by Sutter to Applied to be directed to Applied's Illinois office. Under the circumstances, particularly the parties' specific choice of Illinois law to govern their rights and responsibilities, the Court believes this case to be more like *Martin* than *Oliveira*, and thus we conclude that Sutter can maintain a claim under ICFA despite its non-resident status.

Applied also argues that Sutter cannot maintain a claim under ICFA because it is not a "consumer" who is entitled to protection under the Act, the transaction has no "consumer nexus," and Sutter is attempting to recast an ordinary breach of contract action as a claim of consumer fraud. The Court rejects these arguments for the reasons we have previously and more fully explained in *AGFA Corp. v. Wagner Printing Co.*, No. 02 C 2400, 2002 WL 1559663 (N.D. Ill. July 10, 2002), in which similar arguments were made. First, though ICFA is mainly concerned

10

with protecting consumers, it defines "consumer" as "any person who purchases or contracts for the purchase of merchandise not for resale in the ordinary course of his trade or business but for his use ...," 815 ILCS 505/1(e), and it defines "person" as including corporations and business entities. *Id.* 1(c); *AGFA*, 2002 WL 1559663, at *2. A business entity that, like Sutter, is a "consumer" of the defendant's products need not show that the transaction has a "consumer nexus" but rather only that it suffered an injury caused by the defendant's fraudulent or deceptive acts. *Id.* (citing *Skyline Int'l Development v. Citibank, FSB*, 302 Ill. App. 3d 79, 85, 706 N.E.2d 942, 946 (1998) and other cases). Finally, though ICFA "'was not intended to cover all commercial transactions regardless of the relationship between the parties,'" *id.* (quoting *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 457, 654 N.E.2d 1109, 1114 (1995)), Sutter's allegations that Applied misrepresented the quality of its product and services concern "exactly the type of fraudulent activity [ICFA] is designed to address." *Id.* at 3 (citing, among other cases, *Kirkuff v. Wisegarver*, 297 Ill. App. 3d 826, 838, 697 N.E.2d 406, 415-16 (1998), and quoting it for the proposition that "courts should liberally construe and broadly apply the Act to eradicate all forms of deceptive and unfair business practices.").[2]

### b.  California Unfair Business Practices Act claim

Applied argues that it is entitled to summary judgment on Sutter's claim under the California Unfair Business Practices Act (CUBPA) based on the previously referenced contractual choice of law provision, which according to Applied means that Illinois law governs

---

[2] Applied does not argue that the "non-reliance" clause previously discussed has any bearing on Sutter's ICFA claim.

not just the contract, but all of the parties' rights and duties. The provision states:

> The validity of this Agreement, the construction and enforcement of its terms, and the interpretation of the rights and duties of the parties shall be governed by, and construed in accordance with, the laws of the State of Illinois.

Agreement ¶ 22. Sutter does not challenge Applied's argument that the choice of law provision extends beyond the contract and governs other types of claims as well. Rather, it argues that the choice of law provision should not be honored because California has a materially greater interest in applying its law to the transaction, as the purpose of the CUBPA is to protect California consumers.

In this case, however, the Court is required to follow the choice of law rules of the forum state, Illinois. Illinois applies contractual choice of law provisions unless they are contrary to Illinois public policy. *See, e.g., Scentura Creations, Inc. v. Long,* 325 Ill. App. 3d 62, 69, 756 N.E.2d 451, 456 (2001). Having concluded that Illinois public policy, as embodied in ICFA, permits the protection of an out of state consumer like Sutter in the circumstances presented here, we are hard pressed to conclude that the parties' choice of Illinois law violates this state's public policy.

Moreover, the Court does not see why Applied should be able to argue on the one hand that Sutter cannot take advantage of Illinois' consumer fraud law because it is located in California, and on the other hand that California law should not apply because Sutter and Applied specifically elected to apply Illinois law to govern their rights and duties. Because we have rejected the former argument, the Court has no particular problem with accepting the latter argument and thus concluding that Applied is in fact entitled to summary judgment on Sutter's CUBPA claim.

12

Because, however, the issue of which state's consumer protection law should apply is a somewhat knotty one, to ensure a complete record on appeal the Court intends to determine both claims on their merits at trial and will enter judgment on this claim in Applied's favor on the choice of law point only after conclusion of the trial.

**Motion to strike jury demand**

Applied has moved to strike Sutter's jury demand based on paragraph 22 of the agreement, which states in pertinent part that "[t]o the extent permitted by law, trial by jury is waived for any action between the parties." Agreement ¶ 22. A jury waiver will be enforced if it was made knowingly and voluntarily.

Though it is unclear in this Circuit which party bears the burden on the issue of the voluntariness of the waiver, the Court finds it unnecessary in this case to address that issue. Either way, Sutter is required to come forward with some evidence that calls the voluntariness of the waiver into question, *see, e.g., Reggie Packing Co. v. Lazere Fin. Corp.*, 671 F. Supp. 571, 573 (N.D. Ill. 1987); *Mellon Bank v. Miglin,* No. 92 C 4059, 1993 WL 281111, at *11 (N.D. Ill. Apr. 29, 1993) (Report and Recommendation by Lefkow, M.J.), and it has offered none. Thus even if Applied bears the burden on this point, it has carried it. The evidence reflects that both parties to the agreement are sophisticated commercial entities; though there is no indication that the jury waiver was specifically discussed, the parties spent a significant period negotiating their relationship before they entered into the agreement; the agreement itself is not lengthy or verbose (the main body of the agreement is only nine pages long) and thus the jury waiver is neither hidden nor buried; and although Sutter evidently chose not to have the agreement reviewed by counsel, there is no question that it had the opportunity to do so before it was called upon to

February 9, 2004 at 9:45 a.m.

Date:   January 26, 2004

                                                  MATTHEW F. KENNELLY
                                                  United States District Judge

decide whether to sign it. Finally, Sutter cannot and does not claim to have been taken by surprise; the first sentence of final paragraph of the agreement, just above the parties' signatures, states in all capital letters: "EACH PARTY ACKNOWLEDGES THAT IT HAS READ THE AGREEMENT, UNDERSTANDS IT AND AGREES TO BE BOUND BY ITS TERMS ...." Agreement ¶ 24. The argument that the waiver was hedged by the prefatory language "to the extent permitted by law" gets Sutter nowhere, as the law undeniably permits waiver of the right to a jury trial (as Sutter itself concedes, *see* Sutter Resp. at 3).

In sum, the Court finds that even if Applied has the burden of proof on the issue of voluntariness, it has satisfied that burden. The jury waiver was made knowingly and voluntarily and is therefore enforced. *See generally Great America Leasing Corp. v. Cozzi Iron & Metal Inc.*, 76 F. Supp. 2d 875, 880 (N.D. Ill. 1999). By its terms, the waiver applies to "any action between the parties" and thus is not limited to the parties' respective breach of contract claims but also includes Sutter's ICFA claim.

## Conclusion

For the reasons stated above, defendant's motion for summary judgment [docket # 26-1] is granted in part and denied in part. The motion is granted as to Counts 2 (common law fraud) and 4 (California Unfair Business Practices Act), although Count 4 will proceed to trial for the reasons discussed earlier. The motion is otherwise denied. Applied's motion to strike the affidavit of Diane Kleinecke [# 40-1] is denied, and Sutter's motion to strike the affidavit of Kimberly Noffsinger [# 30-1] is denied as moot. Defendant's motion to strike plaintiff's jury demand [docket # 29-1] is granted. The case will proceed as a bench trial as scheduled on

14