# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 5849 | **DATE** | 3/11/2004 |
| **CASE TITLE** | Sutter Insurance Co. vs. Applied Systems | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)    ☐ Local Rule 41.1    ☐ FRCP41(a)(1)    ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, judgment is entered in favor of defendant on all of plaintiff's claims, and in favor of plaintiff on defendant's counterclaims. Costs will not be awarded.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | MAR 16 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 57 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| OR | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SUTTER INSURANCE CO., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) ) Case No. 02 C 5849 |
| APPLIED SYSTEMS, INC., | ) ) ) |
| Defendant. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MATTHEW F. KENNELLY, District Judge:

On February 9-12, 2004, the Court conducted a bench trial in this case. This constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

Plaintiff Sutter Insurance Company is a California corporation with its principal place of business in that same state. Defendant Applied Systems, Inc. is an Illinois corporation with its principal place of business in this state. The case was transferred here from the Northern District of California pursuant to 28 U.S.C. § 1404(a). Sutter at one point had named several "Doe" defendants, but these were dismissed.

Sutter sells property and casualty insurance in the West Coast region, both directly and through agents. In 1999, the company that provided and maintained the computer software Sutter used to produce and service its insurance policies advised Sutter that it would no longer provide updates of the software as of a particular future date. Sutter searched for a new software provider and solicited proposals from a number of entities, including Applied. Applied's

software system was called the "Diamond System." Applied's personnel made two sales presentations to Sutter at its California offices.

Sutter's insurance business included both "direct bill" and "agency bill" policies. Direct bill policies were those issued and billed for by Sutter itself. Agency bill policies, which represented a significant component of Sutter's business, were those issued through agents working on Sutter's behalf, with the agents collecting premium payments and remitting them to Sutter. Sutter would receive payments, some of which were partial payments, from agents who were forwarding premium payments on more than one insurance policy. Sutter required a mechanism to bill the agents properly, account for partial payments, age accounts receivable, and report on a policy-by-policy basis the amounts paid and due. Sutter's existing software supported agency billing and these other related reconciliation functions.

At Applied's sales presentations, Sutter's and Applied's representatives discussed Sutter's agency billing and related needs. Applied's personnel assured Sutter that the Diamond System was capable of handling agency billing. It is unclear whether these discussions involved much in the way of details, and it does not appear to the Court that there was any significant discussion of the specifics of Applied's needs. However, Applied's agency billing and reconciliation functions followed a pattern standard in the insurance business. Its representatives reasonably believed that Applied's software, represented to be an off-the-shelf system (that is, one that could be implemented with minimal effort), would satisfy these seemingly basic needs.

Sutter's representatives advised Applied's personnel at the sales presentations that Sutter wanted to be able to convert all of its software to a new system by no later than December 31, 2000. After that date, Sutter would be required to pay additional fees to continue to maintain its

former software. Applied was hopeful that it could complete transition by that time, but it made no firm commitment to Sutter, as the speed with which the transition process would occur was, in significant part, in the customer's hands.

Sutter and Applied entered into a written contract entitled "System Implementation and License Agreement" dated March 21, 2000. The initial draft of the Agreement represented a standard form contract used by Applied, with some modifications to particularize it to Sutter. Sutter sought to revise certain substantive terms of the Agreement, but Applied declined. Sutter was, however, able to negotiate a somewhat better price than had been proposed in the initial draft provided by Applied.

The Agreement contemplated that the first line of Sutter's business to be converted to the Diamond System would be Sutter's "preferred homeowner's" line, a relatively new line of business for Sutter which was primarily direct-bill business. The Agreement in its original form did not specifically identify the remaining lines to be converted and did not set a schedule for such conversions; this was left for later negotiation.

The Agreement provided that Sutter would purchase from Applied the software and services specified in Schedule A to the Agreement, together with the system configuration options specified in Schedule B and the programming options specified in Schedule C (there were none of the latter). Schedule A listed, in summary form, the features and functions of the Diamond System. This included a reference to "Agency and Direct Bill Statement Options." Sutter reasonably understood this, particularly in conjunction with Schedule A's references to "Installment Based Billing," "Daily, Monthly, and Yearly Calculation of Written and Earned Premium," and the like, to encompass the agency billing, accounting, reconciliation, and

reporting functions referenced earlier. In fact, however, the Diamond System did not support agency reconciliation in the manner expected by Sutter, though Sutter would not find this out until much later.

The purchase price, described in Schedule F of the Agreement, was $300,000 for the base software system, plus a total of $60,000 for the California preferred homeowner's business line ($35,000 for the business line and $25,000 for the state license). Additional lines of business would also be billed at $35,000 per business line and $25,000 for each state license. Payment was to be made as follows: $75,000 upon signing of the Agreement, $75,000 upon signing and mutual acceptance of a system implementation project plan and time line, $150,000 on the date of first delivery of the base software for testing and evaluation, and $60,000 on the date of acceptance of the California preferred homeowner's business line. "Acceptance" was defined as the earlier of the date of delivery of the system with the functionality needed to "go live," or the date of operational use of the system. The Agreement also provided for payment of support and maintenance fees of $80,000 for the base system, $15,000 for each line of business, and $12,500 for each state.

The Agreement contemplated that Sutter would provide specifications regarding its needs, and Applied would then develop the software to meet those specifications. The finished product would be delivered to Sutter for a period of testing and evaluation, and once this was finished Sutter would "go live" and begin using the system in its day to day operations. In May 2000, Sutter and Applied executed a supplement to Schedule D of the agreement, setting forth a detailed system implementation project plan culminating in final delivery and implementation of "phase 1" (the base system and the California preferred homeowner's line) on July 8, 2000.

4

Applied warranted in the Agreement that "all services provided hereunder will be performed in a good and workmanlike manner and that the Software provided by Applied hereunder will substantially conform to and perform in accordance with the specifications stated in Schedules A, B, C, D, and F, and in all associated documentation." Agreement, ¶ 6(a). Applied disclaimed any other implied or express representations and warranties. *Id.* Sutter represented that "[n]o material statements or representations have been made by Applied and upon which [Sutter] has relied in entering into this Agreement that are not contained herein." *Id.*, ¶ 6(b). The Agreement also recited that Sutter "understands that in the design and development of complex computer software systems limited system defects or errors may be expected," and that Sutter's "sole and exclusive remedy in the event of programming defects is expressly limited to correction of the defects by adjustment, repair or replacement at Applied Systems' sole election and expense." *Id.*, ¶ 7(c).

The Agreement provided that either Sutter or Applied could cancel the Agreement with or without cause at any time prior to the signing of the system implementation project plan and time line (the previously-referenced addition to Schedule D, executed in May 2000), and Applied would refund Sutter's down payment. *Id.*, ¶ 5(a). The Agreement further provided that Sutter could cancel the Agreement with or without cause at any time prior to the initial delivery of the base system – with a cross-reference indicating this meant delivery of the system for testing and evaluation purposes – and if so, Applied would refund Sutter's down payment, less reasonable fees for services rendered. After that date, Sutter could not cancel the Agreement without Applied's consent. *Id.*, ¶ 5(b).

This was not a particularly sensible contract for Sutter to sign, a fact that Sutter

5

presumably realizes in retrospect. The Agreement contemplated that Sutter would pay $150,000 – a significant sum – before seeing any software at all, and another $150,000 upon receipt of the test product before having any clue whether it would perform as hoped and expected. The effect of this was to make the process of developing system specifications vitally important. If Sutter, through oversight or lack of software expertise, left something out of the specifications and realized it was missing only after it received and tested the software, it would be too late at that point to cancel the contract and get its money back. But Sutter had, it appears, no background in developing or assisting in the development of software. Perhaps it should have hired an independent consultant, or perhaps it should have declined to execute the contract after Applied refused to modify its principal terms. Sutter did neither. But it had ample opportunity to say no, and as a sophisticated commercial entity it cannot now sidestep the contract's terms.

Applied's personnel worked with Sutter personnel to develop specifications for the California preferred homeowner's insurance line, the first line to be converted to the Diamond System. The specifications were mutually accepted by both parties, and Applied developed software based on the specifications. This and the base system were first delivered for testing purposes in June 2000. Sutter was also required to purchase hardware, including a printer, to accommodate Applied's software. Applied sent specifications to Sutter for what was required, and one of Sutter's employees acquired hardware at a total expense of over $40,000.

Several Applied personnel traveled to Sutter's offices in early July 2000 expecting to complete the conversion and "go live" with the base system and California preferred homeowner's line. They learned, however, that Sutter did not have the type of printer that Applied had prescribed, which was necessary for the system to work properly. This was the

result of an error on the part of the Sutter employee responsible for purchasing equipment based on the specifications that Applied had provided. Primarily for this reason, Sutter was unable to go live in early July as scheduled.

Instead, the system was activated in August 2000 after a second trip to Sutter's offices by Applied personnel. Sutter experienced numerous problems with the operation of the Diamond System during this trip. Some but not all of these problems were resolved. Applied advised Sutter that problems would be easier to work out if Sutter went live, as once that happened the maintenance and support function would be handled by a different and more experienced team at Applied. Sutter determined to go live and work out the problems as and when they appeared.

Work continued on these issues, as well as others that cropped up later, through the end of 2000 and into January 2001. Applied's personnel worked to solve problems and issues as they arose. Sutter failed to demonstrate that Applied's efforts in this regard below what the contract required. The vast majority of these problems, and perhaps all of them, resulted from particulars not anticipated in the specifications for the preferred homeowner's line that were developed by Sutter in conjunction with Applied, or from the type of adjustment difficulties that reasonably could be expected to result during conversion to a completely new and different software system. Sutter did not prove that these problems resulted from defects in Applied's software or from the software's failure to perform in accordance with specifications.

Sutter billed preferred homeowner's policies directly, not through agents, and thus the question of agency billing functions was not an issue for the preferred homeowner's software. It would become an issue, however, for the next phase of implementation, referred to as the "Tier 1" insurance lines. Following delivery of the base system and preferred homeowner's software,

7

attention turned to developing the specifications for these lines. Sutter accepted the specifications for several of these lines in September 2000. Applied, however, did not retain the actual specifications. The Court cannot determine that the software eventually delivered for testing purposes conformed to the specifications. The burden of this uncertainty falls with Applied, the party that held the specifications and the party with the burden of proof on the counterclaim (which concerns non-payment for the Tier 1 software).

In late October 2000, Sutter and Applied agreed to delay the release of the software for the Tier 1 lines to permit more time for testing. By doing this, Sutter hoped to avoid the types of problems it had continued to experience with the preferred homeowner's line even after it had gone live. Sutter also hoped to resolve the outstanding issues with the preferred homeowner's line before it went live with any additional lines.

In January 2001, Sutter and Applied executed an addendum to the Agreement identifying the Tier 1 lines and setting a price for each line. The addendum was revised from Applied's standard form, to provide that Applied would be paid for these lines only "at completed project signoff." *See* PX 1-91.

The test version of the software for some of the Tier 1 lines was delivered in December 2000, before the contract addendum had been signed. Sutter eventually learned that the software did not include the agency billing and reconciliation functions that it had expected. There were also numerous other problems which resulted in the preparation of a series of "open task" lists that Applied and Sutter personnel worked to resolve. For the most part, these represented the types of problems that one would reasonably expect to experience during the software conversion, development and testing process. But Sutter believed that it was being required to

spend an inordinately large amount of time testing and working the bugs out of what it had been told was an "off the shelf" system. In addition, it eventually became clear that the Diamond System did not support the type of agency billing reconciliation functions that Sutter had expected. Applied personnel provided an alternate means of accomplishing similar results, and Applied advised Sutter that further development work could be done to achieve what Sutter wanted from the software, albeit at an additional cost to Sutter. By May 2001 Sutter was fed up and decided to revoke its acceptance of the Tier 1 software and terminate its relationship with Applied. Sutter never advised Applied that the Tier 1 lines were ready to move into production, and thus the Tier 1 project was never completed.

A telephone conference was held between Sutter and Applied personnel on May 1, 2001. Sutter's representatives stated that they wished to terminate the company's relationship with Applied and did not want to implement any additional software lines, including the Tier 1 lines. Sutter's personnel attributed this to ongoing problems with the Diamond System, the absence of the needed agency bill reconciliation functions, and their belief that Applied's personnel assigned to the project lacked sufficient experience. Applied's representatives also identified problems they had with the process of implementation, including their claim that Sutter's primary contact persons had no decision making responsibility and a purported lack of communication with the responsible Sutter personnel.

In the same telephone conference, Sutter indicated that it intended to continue to use the California preferred homeowner's software. This was so because Sutter had no alternative software that could be used to manage that insurance line; the preferred homeowner's line was a new line of insurance for Sutter which had not been part of its former software system. In the

ensuing days, Sutter advised Applied that it intended to continue using the Diamond System to "run off" the preferred homeowner's policies that had been and would need to be input into the system, until those policies expired. Applied expressed no objection to this. Sutter had no reasonable alternative other than "manual" management of the policies, which was not practicable due to the lack of sufficient personnel. After the May 2001 conversation, Sutter used the Diamond System software only as it had represented it would do.

An internal memorandum circulated within Applied after the May telephone conference reflected that Applied understood that the two companies would be parting ways and would have no ongoing relationship. The memorandum also reflects that Applied understood from the conversation that it was to stop work on the software for the Tier 1 lines that it had been developing for Sutter.

After the May telephone conversation, Sutter contacted other software providers and eventually was able to acquire updates to its previous software, which it continues to use to this day. Sutter incurred additional expense for maintaining its previous software for its lines other than the preferred homeowner's line. However, Sutter did not pay Applied for any additional lines other than the preferred homeowner's line.

Sutter's remaining claims in this case include a claim for breach of contract and claims under the Illinois Consumer Fraud Act and the California Unfair Business Practices Act. Sutter concedes that the statutory fraud claims depend upon the existence of a material misrepresentation by Applied, made with the intent to induce reliance on the part of Sutter. It is likely that both claims are defeated by the contractual disclaimers of prior representations and of reliance. But even if not, Sutter failed to prove by a preponderance of the evidence that Applied

made material misrepresentations. Its representations that the Diamond System was an "off the shelf" system and that it would handle Sutter's agency functions were too vague to be material. The former representation was contradicted in any event by several provisions in the Agreement, in particular those concerning the software development process. The latter representation was not made in a context sufficiently specific that it could be said to have been a false representation at the time it was made; there is no (or at least there is insufficient) evidence that Sutter described to Applied at the two pre-contract sales meetings the particulars of its agency reconciliation requirements.

In its breach of contract claim, Sutter seeks to recover the sums it paid for the base system and the California preferred homeowner's line, as well as for support and maintenance. To prevail, Sutter was required to prove that in some manner Applied breached or failed to live up to the contract. Sutter failed to do so. Specifically, it failed to prove that either the base system or the preferred homeowner's software was defective or that it had failed to comply with the specifications Sutter had set. In addition, as noted earlier, Sutter failed to prove that Applied's support and maintenance work did not conform to contractual requirements.

To be sure, Sutter experienced significant problems in implementing its use of the software. The evidence, however, did not establish that these problems were attributable to defects in the software or non-compliance with specifications. Some of the problems resulted from Sutter's failure to acquire the proper type of printer; some resulted from what turned out to be the unanticipated inadequacy of the specifications that Sutter had prepared and accepted; and some were attributable, quite simply, to the ordinary process of adjustment to a new system. In this regard, it is not particularly surprising that "fixes" were required. There is no such thing, at

11

least in this context, as a perfect software system that can be implemented without adjustments, even significant adjustments. Indeed, that is essentially what the Agreement stated. *See* Agreement, ¶ 7(c).

For these reasons, the Court finds in favor of Applied on Sutter's remaining claims.

In Applied's counterclaim, it seeks to recover the expense it incurred in developing the software for the Tier 1 lines. The evidence showed, however, that these lines did not conform to the specifications "stated in Schedule A," as the Agreement required. *See* Agreement, ¶ 6(a). Specifically, they did not meet Schedule A's representations regarding agency billing and related functions. As noted earlier, these specifications, reasonably construed, communicated to Sutter that the software would conform to its agency billing reconciliation needs. The software failed to do so, and it was not capable of doing so without further work for which Applied proposed to bill Sutter. Without this functionality, the software was effectively worthless.

Because the Tier 1 project was never completed, Sutter never became obligated to pay for the software under the terms of the addendum to the Agreement. Even were this not so, Sutter timely and properly revoked its acceptance of the Tier 1 software in May 2001, which was within a reasonable time after its delivery and after Sutter became aware of the defects. *See* 810 ILCS 5/2-602(1). As the Court has found in an earlier ruling, though the Agreement required cancellation of the Agreement as a whole to be in writing, it imposed no similar requirement (nor does the UCC) on revocation of acceptance of a particular item or items delivered under the Agreement. *See Sutter Ins. Co. v. Applied Systems, Inc.*, No. 02 C 5949, 2004 WL 161508, at *3 (N.D. Ill. Jan. 26, 2004). Because the Tier 1 software failed to conform to contractual specifications, Applied breached its contractually-provided warranty and thus is not entitled to

recover for the cost of developing this software. *See* 810 ILCS 5/2-602(2)(c) ("[T]he buyer has no further obligations with regard to goods rightfully rejected.").

For these reasons, the Court finds in favor of Sutter on Applied's counterclaim.

### Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment in favor of defendant on all of plaintiff's claims, and in favor of plaintiff on defendant's counterclaims. Costs will not be awarded.

MATTHEW F. KENNELLY
United States District Judge

Date: March 11, 2004