# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SUTTER INSURANCE CO., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 02 C 5849 |
| | ) |
| APPLIED SYSTEMS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In this diversity suit, the plaintiff, Sutter Insurance Company, contracted with the defendant, Applied Systems, Inc., to purchase computer software. Sutter claimed that the software did not perform as represented and sued to recover the money it had paid, a total of $492,811 ($360,000 for the software, and $132,811 for service and maintenance). Applied counterclaimed to recover expenses it had incurred in developing further additions to the software that Sutter refused to take. After a bench trial, the Court ruled against Sutter on its claim and against Applied on its counterclaim – essentially leaving the parties where they were before suit was filed. *Sutter Ins. Co. v. Applied Systems, Inc.*, No. 02 C 5849, 2004 WL 524434 (N.D. Ill. Mar. 11, 2004) ("*Sutter I*").

Sutter appealed from the Court's rejection of its claims, but Applied did not appeal from the rejection of its counterclaim. The Seventh Circuit vacated this Court's decision and remanded for further proceedings. *Sutter Ins. Co. v. Applied Systems, Inc.*, 393 F.3d 722 (7th Cir. 2004) ("*Sutter II*"). On remand, the Court requested additional briefs from the parties.

## This Court's prior ruling

Before revisiting the merits, a bit of background is necessary.[1] The trial involved (in addition to the counterclaim) Sutter's claims for breach of contract and under the Illinois Consumer Fraud Act and a parallel California statute. Sutter is a California insurance company that needed to purchase new software to produce and service its insurance policies. Applied is an Illinois producer of software.

Sutter's insurance business included both "direct bill" policies, issued and billed for by Sutter itself, and "agency bill" policies, issued through agents, who collected premium payments from their various clients and remitted them to Sutter in bulk. For the agency bill policies, Sutter required a mechanism to bill the agents properly, account for partial payments, age accounts receivable, and report amounts paid and due on a policy-by-policy basis – functions that we will refer to generically as "agency billing."

As discussed more fully in this Court's original ruling, the contract provided that Sutter would purchase, among other things, the software and services specified in Schedule A to the contract. Schedule A listed the features and functions of the "Diamond System," Applied's base software product. The purchase price, described in Schedule F, was $300,000 for the base system, plus $60,000 for the software for the first line of business that Sutter would convert to the new system - its California preferred homeowner's insurance line of business. Software for additional lines of business would likewise cost $60,000 per line. Of the $300,000 for the base system, $75,000 was paid upon signing of the contract, another $75,000 on acceptance of an

---

[1] The Court incorporates its earlier findings of fact and conclusions of law to the extent they are not incompatible with the ruling we make herein.

implementation plan, and the final $150,000 on the date of first delivery of the system for testing. The $60,000 for the software for the California preferred homeowner's line was due on the date that software was accepted.

A significant portion of Sutter's business involved agency bill policies, and as a result Applied's software was, relatively speaking, worthless to Sutter if it did not support agency billing. In our original ruling, the Court found that the features and functions of the Diamond System described in Schedule A to the contract included features that Sutter "reasonably understood ... to encompass the agency billing, accounting, reconciliation, and reporting functions" that it required. *Sutter I*, 2004 WL 524434, *2. This proved not to be the case. As the Court found, "Sutter eventually learned that the software [for its other lines of business] did not include the agency billing and reconciliation functions that it had expected." *Id.,* *5. Perhaps more importantly for present purposes, it "eventually became clear that the Diamond System did not support the type of agency billing reconciliation functions that Sutter had expected," *id.,* and that Schedule A represented were included and supported. Unfortunately, Sutter did not learn this until much later. The reason is that the California preferred homeowner's line, the first line of business for which software was installed, was a direct bill line of business. It was not until later, when the software for what Sutter calls its "Tier 1" lines was being developed, that Sutter came to learn that the base system did not include or support agency billing. By then, however, Sutter had already paid for the Diamond System and the preferred homeowner's software.

Once it learned that the agency billing functions that it required were missing from Applied's software, Sutter terminated its relationship with Applied, told Applied to stop work on the Tier 1 software, and (later) demanded its money back. *Id.,* *5-6. Sutter kept using the

3

preferred homeowner's software, as it had no other alternative for that line of business, and Applied made no objection. *Id., \*6.*

The Court ruled that Sutter was not entitled to recover the money it had paid for the Diamond System and the California preferred homeowner's software. The Court determined that Sutter had failed to prove that Applied had breached the contract, specifically that it had failed to prove that this software was defective or failed to comply with Sutter's specifications. *Id.* On Allied's counterclaim to recover the expense it incurred in developing the Tier 1 software, the Court determined that this software did not conform to the specifications stated in Schedule A because it did not include or support agency billing and related functions. *Id., \*7.* In short, the Court essentially concluded that the obligations to pay for the base system and for the Tier 1 lines were independent of each other, and that the failure of the Tier 1 lines did not entitle Sutter to recover what it had paid for the base system.

**The decision on appeal**

On appeal, the Seventh Circuit stated that our ruling appeared to be based on an inconsistency: "[i]t says on the one hand that Applied's inability to furnish Sutter with software capable of handling agency billing was not a breach of contract, but on the other hand that Applied's unsuccessful efforts to furnish such software [for the Tier 1 lines] did not conform to the specifications in Schedule A." *Sutter II*, 393 F.3d at 725. The court went on to say that in ruling for Applied on Sutter's claim, this Court "did not explain how Applied's interpretation could be squared with either the language of Schedule A or the extrinsic evidence that had been placed in evidence at the trial." *Id.* There was good reason, the Seventh Circuit stated, to doubt Applied's interpretation of the contract: "it would not make sense for Sutter to pay $360,000 for

4

software good for only a minor line of business," i.e., the preferred homeowner's line. *Id.* at 725-26. The terms of contract, according to the Seventh Circuit, "support an inference that Applied was committing itself to adapt the Diamond System to all of Sutter's lines ...." *Id.* at 726. The court found rather implausible the possibility that Sutter had committed to pay $360,000 for "a pig in a poke" and suggested that this was good reason to reject Applied's proposed interpretation of the contract. *Id.* at 726. "The language [of the contract] as a whole favors Sutter, not Applied. Sutter's interpretation fits both the language of the contract and the contract's commercial setting better than Applied's does." *Id.* But because the Seventh Circuit was uncertain how this Court had reached its conclusion, it remanded the case for further proceedings. *Id.* at 726-27.

## Discussion[2]

We begin by clearing up an apparent misunderstanding of one aspect of the Court's ruling. The Seventh Circuit wondered why extrinsic evidence of the parties' dealings and intentions prior to signing the contract had been introduced without objection, and why this Court had, apparently, ignored that evidence in interpreting the contract. *Sutter II,* 393 F.3d at 725. The answers to both questions are simple. The extrinsic evidence was introduced, and no objection was made, because Sutter had made fraud-in-the-inducement claims under the consumer fraud statutes of Illinois and California. The parol evidence rule did not govern those claims – or at least no argument was made that it did. But the admission of that evidence on the

---

[2] The Court rejected on remand Applied's proposal to offer additional evidence on certain points. *See* Applied Resp. to Sutter Status Conf. Stmt. at 3. The case was tried fully and completely, and both sides had a fair opportunity at trial to offer all the evidence they thought was relevant. Applied offered nothing to support the conclusion that it lacked an incentive to offer any necessary evidence at trial.

fraud claims did not make its consideration proper in construing the contract for purposes of the breach of contract claim. The Court did not then and does not now rely on the extrinsic evidence in determining that claim.

On remand, Sutter urges the Court to adopt the construction of the contract suggested by the Court of Appeals. Applied objects, contending that the issue was waived at the trial level. The Court disagrees. Sutter's contention throughout this litigation has been that the defects, including the lack of an agency billing function, infected Applied's software. In its complaint, Sutter alleged that "Applied breached the [contract] by failing to provide software that would conform to and perform in accordance with specifications as represented," 2d Am. Compl. ¶ 26, and that "the software is completely unusable." *Id.* ¶ 27.

It is of no consequence that, as Applied contends, Sutter may have failed to challenge on appeal the Court's finding that it had not proven that the base system was defective. First of all, that finding – as we will discuss momentarily – was premised on the view that the contract was effectively severable as between the Diamond System and Tier 1 software. That, however, is precisely what the Court of Appeals found unsupportable. Second, the Seventh Circuit unambiguously vacated the judgment and remanded for further proceedings. *Sutter II*, 393 F.3d at 727. There is nothing in the court's ruling that suggests that it intended to constrain on remand this Court's ability to reconsider its findings.

Upon reconsideration, and taking into account the comments of the Court of Appeals, this Court concludes that there was indeed an inconsistency in our findings that warrants reconsideration of our ruling. As recounted earlier, the Court specifically found that the features and functions of the Diamond System that were described in Schedule A to the contract included

6

features that Sutter "reasonably understood ... to encompass the agency billing, accounting, reconciliation, and reporting functions" that it required. *Sutter I*, 2004 WL 524434, *2. We also found that this later proved to be untrue. *Id.*, *5. Despite this, the Court found in our original ruling that Sutter had failed to prove that the base system was defective. *Id.*, *6. The latter finding was incompatible with the former findings. In the contract, Applied warranted that its software "will substantially conform to and perform in accordance with the specifications stated in Schedule[ ] A ...." Agreement ¶ 6(a). But if Schedule A represented that the Diamond System included and supported agency billing functions, and the Diamond System failed to include and support those functions – as the Court found was the case – then Applied breached the warranty it made in the contract. Even though, as the Court found, the contract required any cancellation by Sutter to be made before delivery of the base system, *see* Agreement ¶ 5, that provision did not trump Applied's express warranty. Thus even if it was not until after the time for cancellation had passed that it became apparent the warranty had been breached, Sutter was still entitled to sue and recover for breach of the warranty.

For these reasons, the Court finds, upon reconsideration, that Sutter proved by a preponderance of the evidence that Applied breached the contract by delivering a base system that did not conform to the specifications in Schedule A. Sutter therefore is entitled to judgment on Count 1, its breach of contract claim. Applied remains entitled to judgment in its favor on Counts 2, 3, and 4, Sutter's common law fraud claim (which was disposed of on summary judgment) and its statutory fraud claims (on which it prevailed at trial).

In its supplemental response brief, Applied asks the Court to permit further briefing on the issue of damages in the event of a reversal of the original judgment. Though Applied ought

to have addressed damages in that brief – Sutter had devoted an entire section to the point – we will give it an opportunity to make a prompt written submission, not to exceed five pages (Sutter's discussion of damages covered three pages of its brief).

## Conclusion

Applied's written submission on damages, not to exceed five pages, is to be made by no later than April 29, 2005. Sutter may file a reply, not to exceed five pages, by no later than May 9, 2005.

*[signature]*
MATTHEW F. KENNELLY
United States District Judge

Date: April 18, 2005